1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

9

LONNIE DEFORE DELANEY,

No.  1:15-cv-01289-LJO-SKO  HC

10

Petitioner,

**FINDINGS AND RECOMMENDATION THAT THE COURT DISMISS PETITION FOR WRIT OF HABEAS CORPUS AS UNTIMELY**

11

v.

12

JOSIE GASTELO, Warden at California Men's Colony,

13

Respondent.

14

**(Doc. 22)**

15
16
17
18
19

Petitioner Lonnie Defore Delaney is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent Josie Gastelo, Warden, California Men's Colony, San Luis Obispo, California, moves to dismiss the petition as untimely.  The undersigned agrees that the petition is untimely and recommends that the Court dismiss it.

20

**I.     Procedural and Factual Background**

21
22
23
24
25
26
27
28

In Kern County Superior Court on December 20, 2001, Petitioner was convicted of shooting at an inhabited dwelling house (Cal. Penal Code § 246), allowing the discharge of a firearm from a motor vehicle (Cal. Penal Code § 12034(b)), and possession of a firearm by a felon (Cal. Penal Code § 12021(a)(1)).  On January 11, 2002, Petitioner moved for a new trial and for an order disclosing personal information of two jurors who allegedly failed to reveal to the court that they knew Petitioner.  On January 22, 2002, the trial court denied the new trial motion.  The  court then imposed an indeterminate sentence of fifteen years to life imprisonment with the

1

possibility of parole.  On February 7, 2002, Petitioner filed a direct appeal to the California Court of Appeal, Fifth Appellate District.

On January 15, 2004, the Court of Appeal reversed and remanded the case to the Superior Court to conduct a hearing to determine the necessity of disclosure of confidential identifying information of two jurors who may have known Petitioner.  On February 26, 2004, Petitioner filed a petition for review with the California Supreme Court, which denied the petition on March 30, 2004.

On August 6, 2004, the Kern County Superior Court convened a hearing regarding identification of the jurors and again denied Petitioner's new trial motion.  As a result, the Superior Court reinstated the judgment of conviction.  On February 3, 2006, the California Court of Appeal affirmed.  On March 10, 2006, Petitioner filed a petition for review, which the California Supreme Court denied on April 26, 2006.

On July 26, 2005, Petitioner filed a petition for writ of habeas corpus in the Kern County Superior Court.  On August 8, 2005, the Superior Court denied the petition, finding that Petitioner failed to state a prima facie case for relief.  On August 8, 2006, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  The Court of Appeal summarily denied the petition on September 14, 2006.  On June 13, 2007, Petitioner filed a habeas petition in the California Supreme Court, which summarily denied the petition on November 28, 2007.

On March 24, 2008, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this court.  *See Delaney v. Dextor* (E.D.Cal.) (No. 1:08-cv-00418-AWI-SMS HC). On July 7, 2008, the Court adopted the Magistrate Judge's findings that the petition did not allege facts indicating exhaustion of claims and dismissed the petition with leave to amend.  *Id.* On September 8, 2008, the Court dismissed the petition for failure to prosecute.  *Id.*

///

On December 23, 2013, Petitioner filed a petition for writ of habeas corpus in the Kern County Superior Court. The petition presented the declaration of Isaac Darrell Rand, the passenger who pleaded guilty to charges arising from his firing a gun from the car that Petitioner was driving. Rand declared that Petitioner was not present at the scene of the shooting and that the car was driven by Petitioner's late brother Donte Delaney.[1] The Superior Court denied the petition on April 8, 2014. On July 29, 2014, Petitioner filed a habeas petition with the Court of Appeal, which denied relief on September 25, 2014.

On November 25, 2014, Petitioner filed another habeas petition in the Court of Appeal, which summarily denied the petition on January 23, 2015. On March 23, 2015, Petitioner filed a petition with the California Supreme Court, which summarily denied it on July 8, 2015.

Petitioner filed the above-captioned petition on August 4, 2015. Respondent moved to dismiss the petition as untimely on February 5, 2016.

## II.    Timeliness of the Pending Petition

### A.    Commencement of the Statutory Limitations Period

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which applies to all petitions for writ of habeas corpus filed after its enactment. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA provides a one-year period of limitation in which a petitioner may file a petition for writ of habeas corpus. 28 U.S.C. § 2244(d)(1). The limitations period is measured from the latest of:

> (A)    the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)    the date on which the impediment to filing a State action in violation of the Constitution or laws of the United States is

---

[1] According to a list of cold cases maintained by the Bakersfield Police Department, Donte Delaney died June 25, 2008. *See* www.bakersfieldcity.us/gov/depts/police/crime/cold_cases_2000__2009.htm.

3

removed, if the applicant was prevented from filing by such state action;

(C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Direct review in the State of California ended April 26, 2006, when the California Supreme Court denied the petition for review.  The statutory limitation period began on July 26, 2006, following the expiration of the 90-day period in which to file a petition for writ of certiorari in the United States Supreme Court.

**B.**     **Tolling of Statutory Limitation Period**

The limitation period is tolled during the pendency of a properly filed application for State post-conviction relief or other collateral review with respect to the pertinent judgment or claim. 28 U.S.C. § 2244(d)(2).  As detailed in the procedural and factual background above, Petitioner has filed multiple state collateral actions.

Under California law, "a state prisoner may seek review of an adverse lower court decision by filing the original petition (rather than a notice of appeal) in the higher court, and that petition is timely if filed within a 'reasonable time.'" *Evans v. Chavis*, 546 U.S. 189, 192-93 (2006).  "As long as the prisoner filed a petition for appellate review within a 'reasonable time,' he could count as 'pending' (and add to the 1-year time limit) the days between (1) the time the lower state court reached an adverse decision; and (2) the day he filed a petition in the higher state court." *Id.* at 193.

When the state court has explicitly ruled that the gap period between the lower court's decision and the prisoner's filing of an appeal or new petition was unreasonable, a federal court need conduct no further inquiry.  *Carey v. Saffold*, 536 U.S. 214, 225-26 (2002).  If the state court did not explicitly state whether the gap period was reasonable or unreasonable, the federal court must look to the state supreme court's decisions to determine whether the state would consider

4

the second action to have been filed within a reasonable time. *Evans*, 546 U.S. at 198.

In California, unjustified delays greater than six months are clearly unreasonable. *Id.* at 201. The Ninth Circuit agreed that in the absence of unusual facts justifying further delay, "a time gap in excess of six months was too long." *Waldrip v. Hall*, 548 F.3d 729, 731 (9th Cir. 2008). In many cases, shorter gaps have been found unreasonable. *See, e.g., Stancle v. Clay*, 692 F.3d 948, 956 (9th Cir. 2012) (denying tolling for an 82-day delay); *Velasquez v. Kirkland*, 639 F.3d 964, 967-69 (9th Cir. 2011) (denying tolling for 80 and 91-day gaps); *Banjo v. Ayers*, 614 F.3d 964, 970 (9th Cir. 2010) (finding 146-day gap unreasonable); *Chaffer v. Prosper*, 592 F.3d 1046, 1048 (9th Cir. 2010) (*per curiam*) (no tolling for delays of 101 and 115 days).

Petitioner's first habeas petition, filed in Kern County Superior Court on July 26, 2005, was resolved on August 8, 2005, before the conclusion of his direct appeal. As a result, no tolling is necessary for this action. *See Waldrip*, 548 F.3d at 735 (holding that a habeas petition filed and resolved before state direct review became final has no effect on the timeliness of the ultimate federal filing).

The statutory limitations period began on July 26, 2006, and ran for 13 days before Petitioner filed a habeas petition in the Court of Appeal on August 8, 2014. After the Court of Appeal denied the petition on September 14, 2006 (37 days), Petitioner took no further action until filing a habeas petition in the California Supreme Court 272 days later on June 13, 2007. Under the cases summarized above, Petitioner is not entitled to tolling during the 272-day gap, at the end of which the remaining limitations period was 80 days. The statute was tolled for 168 days from its filing on June 13, 2007, until the California Supreme Court summarily denied the petition on November 28, 2007. The limitation period then ended 80 days later on February 18, 2008. Petitioner's subsequent state actions did not revive the limitations period. *Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003).

**C.     Conclusion**

The above-captioned petition filed on August 4, 2015, was untimely.

///

///

1    **III.    No Actual Innocence**

2          In light of Rand's declaration, Petitioner contends that the statute of limitations does not

3    apply because he is actually innocent.  Respondent disagrees.

4          **A.      Circumventing the Statute of Limitations Through Actual Innocence**

5          A prisoner's actual innocence, if proven, permits him to circumvent the statute of

6    limitations.  *Schlup v. Delo*, 513 U.S. 298, 315 (1995).  "[T]enable actual-innocence gateway

7    pleas are rare."  *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013).  "[A] petitioner does not

8    meet the threshold requirement unless he persuades the district court that, in light of the new

9    evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable

10   doubt."  *Schlup*, 513 U.S. at 329.  "[T]he *Schlup* standard is demanding and permits review only

11   in the extraordinary case."  *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quote omitted).

12         In evaluating an actual innocence claim, "[t]he court's function is not to make an

13   independent factual determination about what likely occurred, but rather to assess the likely

14   impact of the evidence on reasonable jurors."  *Id.*  The court must consider the "overall, newly

15   supplemented record," including the credibility of the witnesses presented at trial.  *Id.*

16         In this case, the relevant question is the identification of Petitioner as the individual

17   driving the maroon car from which shots were fired at the victims' house, on L Street in

18   Bakersfield, on June 7, 2000.  Petitioner contends that in light of the testimony of Latasha

19   Anderson and Lakevia Davis that they had lied in their initial police statements because they were

20   afraid of the police, who had threatened to take their children away, no reasonable juror would

21   have voted to convict him if they had learned of Rand's statement.

22         **B.      Trial Evidence**

23         Trial testimony revealed that Bakersfield Police Officers Christopher Feola and Joel

24   Luera, who had been investigating a nearby incident, responded to the scene immediately upon

25   hearing the gunshots.[2]  They encountered a small burgundy car leaving the scene.  Although the

26   car's headlights and interior lights were out, the officers illuminated it with their spotlight and

---

[2] Factual information is derived from the California Court of Appeal opinion in Petitioner's direct appeal and review of the state record as a whole.  *People v. Delaney*, 2004 WL 65253 (Cal.App. Jan. 15, 2014) (No. F039942) (Lodged Doc. 2).

1   saw two black men in dark clothing inside the car.  Feola obtained a partial license plate number

2   and broadcast the information to other responding officers.

3        When the car stopped in front of two houses on K Street, the spotlight illuminated an

4   armed black man as he exited the passenger door and fled.  Feola testified that the weapon had a

5   distinctive barrel and a protruding magazine.  As Feola and Luera pursued the passenger in their

6   squad car, Feola saw the other suspect slumped in the driver's seat of the burgundy car.  He

7   testified that he thought "it was one of the Delaney brothers," explaining that the brothers had

8   unusually large heads and distinctive chins.[3]

9        Using the partial license plate number, police determined that the burgundy car was a

10  Mazda registered to Latasha Anderson.  On June 8, 2000, police located the car parked outside an

11  apartment on Second Street near the scene of the shooting.  Anderson and her cousin, Lakevia

12  Davis, were in the apartment.  Anderson told officers that she was the only person who used the

13  car, that she had used it early on the evening of June 7, 2000, and then brought her keys inside

14  and left them on the kitchen counter.  Davis said no one had used the car that night.

15       Investigating Officer Gaines told Anderson that he did not believe her account, that he

16  was going to impound her car for investigation, and that she and Davis could well be arrested as

17  co-conspirators.  He threatened them with jail if they did not tell him the truth.  Gaines described

18  Anderson and Davis as belligerent and uncooperative.  He denied threatening to take away their

19  children as Anderson and Davis later alleged.  Officers put Anderson and Davis, neither of whom

20  was handcuffed, into separate patrol cars for transport to the police station.  The Court of Appeal

21  recounted:

22          Detective Carruesco and Officer Peery separately interviewed
            Anderson in the patrol car, and the interview was tape-recorded
23          without her knowledge.  According to the transcript, Carruesco
            stated he wasn't trying to get Anderson into any trouble but asked
24          what happened.  Anderson stated that she knew appellant as
            "Squeak," that he was a "West Sider," and he previously borrowed
25          her car.  Anderson further stated appellant arrived at her apartment
            sometime between 9:00 p.m. and 11:00 p.m. the previous night,
26          grabbed her car keys, and left.  Appellant returned sometime after

27  _____
    [3] The prosecution introduced mugshots of four of the Delaney brothers, Petitioner, DeMark, Donte, and Michael, at
28  trial.  *See* unnumbered Lodged Document (Supplementary Clerk's Transcript).  A strong family resemblance is
    apparent.

midnight, placed the keys on the kitchen counter, and didn't act nervous. Appellant didn't say anything about the shooting. Anderson stated appellant called her later that night, and asked her to call a particular number. Anderson "told him I couldn't call over there because uh he blocked the number out." Anderson later heard about the shooting from a friend who said that "bullets [were] just flying."

Detective Carruesco and Officer Peery then interviewed Davis in the second patrol car, and she didn't know their conversation was being tape-recorded. Officer Peery asked Davis to tell him every detail about the previous night. Davis stated appellant arrived between 8:00 p.m. and 9:00 p.m. and took Anderson's car keys. Appellant was accompanied by "Isaac," who was also known as "Baby Squeak." Davis knew appellant was known as "Squeak," and appellant and Isaac were both from "West Side." Appellant and Isaac left in the car, and appellant returned by himself about 20 minutes later and left the keys. Appellant didn't say anything to them, he didn't act upset, and he seemed calm. Davis believed appellant called Anderson later that night. Davis knew there had been a shooting in the area but didn't know any details.

*Delaney*, 2004 WL 65253 at *3-*4.

Later, Anderson and Davis were reluctant to testify in Petitioner's trial and ultimately changed their stories:

Jay Winn, the prosecution's investigator, testified he served subpoenas on Davis and Anderson on October 3, 2001, to appear as prosecution witnesses. Winn explained their legal obligation to appear at trial. Davis was very hesitant and said appellant was a hard-core gang member, and she feared for her safety and that of her family. Winn offered to relocate and assist her family. Anderson told Winn she had to think about whether she was going to appear because appellant was a gang member, and he and/or his friends could get to her. Winn also offered to relocated Anderson and help her family, and Anderson agreed to talk to the prosecutor or another investigator. Winn further explained that she could be arrested if she didn't appear, and Anderson replied she'd rather be in jail than be killed. Neither Davis nor Anderson told Winn they were afraid of the police.

Latasha Anderson was subsequently arrested for failing to appear. On October 4 or 5, 2001, Walter Newport, another prosecution investigator, contacted Anderson in jail and asked why she didn't appear. Anderson replied she was afraid of appellant and the people he knew, but she hadn't been threatened yet. Anderson admitted appellant came to her residence on June 7, 2000, and asked to borrow her car. Anderson agreed and he was gone for about 45 minutes. Anderson further stated that Davis was present when appellant asked to borrow the car.

At trial, the prosecution played the tape recordings of the police interviews with Davis and Anderson. Davi[s] and Anderson

8

testified as extremely reluctant prosecution witnesses. Davis testified she knew appellant as "Squeak," and her boyfriend Eric "Elo" Nichols from the West Side. Davis testified that on the night of the shooting, she remained at the apartment and Anderson left to visit someone. Anderson returned between 11:00 p.m. and midnight. Davis testified Anderson's burgundy Mazda was parked outside all night.

Davis testified that the police later arrived at Anderson's house, stated that Anderson's car had been used in a drive-by shooting the previous night, and asked Davis if she knew anything about the whereabouts of the car. Davis testified she initially "told them the truth, that I didn't know who had the car." Davis testified the officers returned a few hours later and asked her to get into a police car, and "they pressured me and forced me to say that [appellant] had the car." Davis admitted she told police that appellant came by the house with "Isaac," also known as "Baby Squeak," appellant took the car keys, appellant and Isaac left in the burgundy car, and appellant was a "West Sider." Davis also told the police that appellant returned by himself a short time later and dropped off the car.

Davis testified the truth was she didn't know who had the car that night, and she just agreed with what the officers said because she was scared of going to jail. Davis testified five to 10 officers told her she would go to jail for 15 years if she didn't tell them that appellant had the car. Davis testified she didn't know the interview had been taped but insisted the officers threatened her before the tape-recorded interview began, and they "guided" her through her answers.

Davis denied she was afraid to testify against appellant but claimed she was afraid of the police. Davis admitted that she only appeared at trial because she received a subpoena, she was arrested, and she was forced to appear. Appellant had never threatened her, and she hadn't talked to him about the incident or her testimony.

Latasha Anderson testified that on the evening of the shooting, she was "in and out" of her apartment and visited a neighbor. She couldn't remember if she used her burgundy Mazda. When the police questioned her about the car, they scared her children and demanded to know who used the vehicle that night. She replied that she didn't know and told the police that "people drive my car all the time. My keys was [*sic*] welcome to anybody who wanted to come and drive my car. My house was open to anybody who wanted to come and eat [and] use the phone, use the bathroom or whatever." Anderson told the officers that appellant had never borrowed her car. Anderson testified that the officers said that "if I did not say he had my car, I was going to jail for ten or fifteen years, my kids was going to get took away from me, I was going to have a felony on my record, I wouldn't be able to get a good job nowhere." Anderson just said "yes" to whatever the police asked her: that appellant was one of the people who borrowed her car that night, and he just grabbed the keys and left. Anderson testified that

these statements weren't true but the police threatened to put her in jail for 10 years.

Anderson didn't know the police taped the interview. Anderson testified that some of her statements in the tape-recorded interview were true and "some is not." She testified that appellant was affiliated with West Siders and his nickname was "Squeaky," but he never borrowed her car that night. Anderson insisted that "people drove my car all the time, different people. They know they had access to my keys. They knew where they was at. They knew they would be on the counter. If they want to drive my car, they didn't even have to ask." She only told the police that appellant took the car because the police "made me" say it and threatened to put her in jail.

Anderson testified she lied to the police when she claimed to be afraid of appellant. Anderson insisted she wasn't afraid of him and he never talked to her about the case, but she was afraid to testify because the police harassed her. Anderson admitted that she was subpoenaed but she only appeared because the police arrested her.

*Delaney*, 2004 WL 65253 at *4-*6.

In rebuttal, the prosecution presented testimony from the police officers concerning the

Anderson's and Davis's changing their stories:

Officer Peery testified he escorted Anderson and Davis to the patrol cars prior to their tape-recorded interviews, and he did not threaten them in any way. Detective Carruesco testified he spoke with Anderson before he started the tape-recorded interview, but he did not threaten or pressure her, and he just said to tell the truth.

Detective Carruesco testified as an expert on criminal street gangs. Appellant was a member of the West Side Crips and was considered an "original gangster" or "shot caller." Appellant had a prior conviction in 1994 for possession of cocaine for sale. Appellant had been shot several times in a gang-related drive-by shooting in February 2000. When appellant was booked in this case, he claimed, "West Side Crip" and wanted to be kept away from members of the Bloods. Appellant's gang moniker was "Squeak" or "Squeaky." Isaac Rand was also a member of the West Side Crips and was known as "Lil Squeak" because appellant took him under his wing and guided him through the gang. Carruesco had investigated over 50 gang shootings and had extensive knowledge of the West Side Crips, and testified their activities included narcotics dealing, assaults, shootings, and thefts. Carruesco described several predicate offenses committed by the West Side Crips, one of which involved appellant's brother Eric Delaney. Eric and Michael Delaney were also members of the West Side Crips. Carruesco was familiar with the Delaneys and conceded they all looked similar.

Detective Carruesco testified that gang members often use the vehicles of female associates to commit drive-by shootings because

10

they can easily persuade the women to give them their cars and not to talk. In a typical drive-by shooting, there would be at least two people in the car to commit the offense. Carruesco believed appellant and Isaac Rand committed the drive-by shooting at 720 L Street because the duplex was occupied by the Bloods, a rival gang, in the heart of Crip territory. Carruesco believed the shooting was intended to drive the Bloods from the neighborhood and committed in furtherance of the West Side Crips, and the Bloods attempted to return fire from the duplex.

*Delaney*, 2004 WL 65253 at \*6.

The defense introduced no evidence or witnesses. Petitioner did not testify.

## C.    State Court Determination

The Kern County Superior Court denied the 2013 petition for writ of habeas corpus, holding that neither constitutional error nor new evidence pointed to Petitioner's innocence.[4] The Superior Court found three reasons that precluded a grant of habeas relief.

First, the evidence in Rand's declaration existed at the time of trial. Rand offered no adequate explanation for his delay in coming forward.

Second, Rand's declaration focused on police procedures rather than providing substantive detail regarding the night of the shooting. The declaration misstated the date of the incident and rationalized that Rand entered his guilty plea "as protecting a friend and not to exonerate petitioner." Lodged Doc. 16. The state court found Rand's statement that Petitioner was not present at the shooting to be conclusory and not grounded in facts.

Finally, the state court rejected the assumption that Anderson and Davis had reliably recanted the initial police statements in which they implicated Petitioner. The jury rejected Anderson's and Davis's allegations of police misconduct as not credible in light of the substantial physical evidence and the prosecution's rebuttal testimony from the police officers. Because there was no way to effectively cross-examine Anderson and Davis, their testimony at trial had to be viewed with suspicion, particularly since their recantations were insufficient to undermine the finality of the judgment.

///

---

[4] Because the California Appellate Court and Supreme Court summarily denied review, the Court must "look through" the summary denial to the last reasoned decision, which is, in this case, the opinion of the Kern County Superior Court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).

11

1   The jury had the opportunity to listen to the complete taped interviews with Anderson and

2   Davis, and Petitioner provided no other evidence that police used coercive tactics against

3   Anderson and Davis.  Although Anderson and Davis may well have been afraid of being jailed as

4   accessories to the shooting, the evidence established that Anderson and Davis were "equally if not

5   more frightened to testify against petitioner."  Lodged Doc. 16.

6   **D.      Actual Innocence Not Established**

7   According to the standard set forth above, Petitioner could not reach the threshold

8   requirement of actual innocence "unless he persuade[d] the district court that, in light of the new

9   evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable

10   doubt."  *Schlup*, 513 U.S. at 329.  Petitioner failed to meet that standard.

11   The undersigned agrees that Rand's declaration, when considered with the existing record,

12   does not establish that "no juror, acting reasonably, would have voted to find [Petitioner] guilty

13   beyond a reasonable doubt."  *Schlup*, 513 U.S. at 329.  Rand's declaration presents serious

14   credibility issues because of (1) the thirteen-year delay between the incident and the declaration;

15   (2) the near absence of detail regarding the incident in the declaration; (3) the conclusory nature

16   of the affidavit; (4) Petitioner's superior position to Rand in the gang hierarchy; and (5) the

17   mentoring relationship between Petitioner ("Squeak") and Rand ("Lil Squeak").   Further,

18   because the jury had the opportunity to hear the recorded interviews of Anderson and Davis, no

19   reasonable juror would likely agree with Petitioner's assumption that Anderson's and Davis's

20   trial testimony was credible but that their statements to police immediately following the shooting

21   were incredible and the product of improper police coercion.

22   Petitioner has failed to establish actual innocence to overcome the statute of limitations.

23   **IV.      Mixed Petition**

24   Respondent contends that even if Petitioner had managed to surmount the substantial

25   barriers to proving actual innocence, the petition could not proceed because all the grounds for

26   relief alleged in it have not been exhausted.  The undersigned agrees.

27   A petitioner who is in state custody and wishes to collaterally challenge his conviction by

28   a petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).

12

1   The exhaustion doctrine is based on comity to the state court and gives the state court the initial

2   opportunity to correct the state's alleged constitutional deprivations.  *Coleman v. Thompson*, 501

3   U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509, 518 (1982); *Buffalo v. Sunn*, 854 F.2d 1158,

4   1163 (9th Cir. 1988).

5       A petitioner can satisfy the exhaustion requirement by providing the highest state court

6   with a full and fair opportunity to consider each claim before presenting it to the federal court.

7   *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Picard v. Connor*, 404 U.S. 270, 276 (1971);

8   *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996).  A federal court will find that the highest state

9   court was given a full and fair opportunity to hear a claim if the petitioner has presented the

10  highest state court with the claim's factual and legal basis.  *Duncan*, 513 U.S. at 365; *Keeney v.*

11  *Tamayo-Reyes*, 504 U.S. 1, 8 (1992).  The petitioner must also have specifically informed the

12  state court that he was raising a federal constitutional claim.  *Duncan*, 513 U.S. at 365-66.  If the

13  petition is not fully exhausted, the Court must dismiss it as a "mixed petition."  28 U.S.C.

14  § 2254(b)(1); *Rose*, 455 U.S. at 521-22.

15      As his seventh ground for relief, petitioner contends that his Sixth Amendment right to

16  effective assistance of counsel was violated because trial counsel permitted an unqualified police

17  officer to testify as a gang expert.  Petitioner never advanced a claim of ineffective assistance of

18  counsel in state court.  Accordingly, even if Petitioner could have established actual innocence to

19  circumvent the statute of limitations, the Court would have had to dismiss the petition as not fully

20  exhausted.

21      **V.    Certificate of Appealability**

22      A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a

23  district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v.*

24  *Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a

25  certificate of appealability is 28 U.S.C. § 2253, which provides:

26          (a) In a habeas corpus proceeding or a proceeding under section 2255
             before a district judge, the final order shall be subject to review, on appeal, by
27           the court of appeals for the circuit in which the proceeding is held.

28

(b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B)  the final order in a proceeding under section 2255.

(2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication.  Accordingly, the Court should decline to issue a certificate of appealability.

///

///

14

**IV.** **Conclusion and Recommendation**

The undersigned recommends that the Court dismiss the petition for writ of habeas corpus and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **June 29, 2016**                    /s/ *Sheila K. Oberto*
                                 UNITED STATES MAGISTRATE JUDGE

15